Filed 2/10/26  S.R. v. Superior Court CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

# FIRST APPELLATE DISTRICT

# DIVISION TWO

|  |  |
|---|---|
| S.R.,<br><br>          Petitioner,<br><br>v.<br><br>SONOMA COUNTY SUPERIOR COURT,<br><br>          Respondent;<br><br><br>SONOMA COUNTY HUMAN SERVICES DEPT.,<br><br>          Real Party in Interest. | A174959<br><br>(Sonoma County<br> Super. Ct. No. 25JD00108) |

S.R. (Mother) has filed a petition for extraordinary relief from juvenile court orders denying Mother reunification services with her daughter, M.R. (Minor), and setting a hearing under Welfare and Institutions Code[1] section

---

[1] Further undesignated statutory references are to the Welfare and Institutions Code.

1

366.26.[2]  In prior dependency cases, Mother failed to reunify with Minor's older half-siblings and her parental rights were terminated.  In the current case, the court found that bypass provisions of section 361.5, subdivision (b) (section 361.5(b)) applied and that Mother failed to show reunification services would be in Minor's best interest.

Mother contends no substantial evidence supports the court's finding that Mother did not make a reasonable effort to treat the problems that led to the removal of Minor's half-siblings and the court abused its discretion in not finding services are in Minor's best interest.  We deny Mother's petition.

## FACTS AND PROCEDURAL BACKGROUND

*Background*

Mother's children include daughters A.R. (born in 2010), M.S. (born in 2013), and Minor (born in 2022).  Mother acknowledges that from 2011 to 2025, there were 24 referrals to child welfare services regarding one or more of A.R., M.S., and Minor.[3]  Mother also acknowledges she has a long history

---

[2] Mother also filed a motion to augment the record on appeal on January 5, 2026.  The motion is granted.

[3] In addition, before she had A.R., M.S., and Minor, Mother had two older sons.  In 2000, there were two referrals for general neglect.  As described in a later social services report, it was reported that Mother "always yells and screams and put holes in the walls" and, in another referral, that Mother "got in the car and screeched down the street with the baby in the car and almost hit another car" and "when the mother is upset, she becomes abusive towards everyone including the baby."  There was another referral in 2004 alleging emotional abuse of the boys.  Mother reportedly hit her own mother and broke a door while holding one child with the other child nearby.  It was reported that Mother "presents with severe mood swings," "[w]hen she is angry, she will scream, curse, slam, and break things," and "[s]he has thrown things into the walls in the past."  In 2004, Mother was referred to parenting and anger management courses, and the boys' father obtained custody of them.

of struggling with methamphetamine use[4] and a criminal history that includes convictions for infliction of corporal injury on a cohabitant, DUIs, and disorderly conduct while under the influence of drugs.

*Prior Substantiated Referrals and Dependency Cases Involving Minor's Half-Siblings, A.R. and M.S.*

In 2011, it was reported that Mother had severe mental health issues and possibly was using methamphetamine; she reportedly drove recklessly and was involved in a hit and run with A.R. in the car.[5] The referral was substantiated, and Mother was provided informal supervision including drug assessment and/or treatment, parenting classes, and mental health counseling. As part of this referral, Mother attended a psychotropic medication assessment, was diagnosed with depressive disorder, anxiety disorder, and borderline personality disorder, and was prescribed Wellbutrin and Buspar. At that time, Mother described having difficulty controlling her anger.

In 2013, A.R. and M.S. were detained, and dependency petitions alleging neglect were sustained. The petitions were based on exposure to domestic violence between Mother and the presumed father and the allegation that Mother " 'has an anger management problem and has exposed the child to verbal outbursts and rages." The petition further alleged, " 'The parents' anger management issues, ongoing domestic violence relationship, and failure to protect place[] the child at substantial risk of physical harm, abuse and/or neglect.' " In July 2014, A.R. and M.S. were returned to

---

[4] In a prior dependency, Mother reported she began using methamphetamine when she was 14 years old. Mother was 45 years old when Minor was removed in the current case.

[5] All referrals and dependencies involving A.R. and M.S. were in Sacramento County.

Mother's care with family maintenance services, but in August 2014, A.R. and M.S. were again removed from Mother's care based on Mother's physical abuse of A.R.  A.R. and M.S. were eventually returned to Mother's custody with family maintenance services, and the dependencies were dismissed in 2015.  During these dependency cases, Mother tested positive for methamphetamine.

In 2016, new dependency cases were initiated for A.R. and M.S., resulting in termination of Mother's parental rights.  These dependencies were based on allegations of ongoing domestic abuse between Mother and the presumed father, Mother's anger management issue, and the father's untreated substance abuse.  In finding jurisdiction over A.R. and M.S., the juvenile court specifically found that Mother "has . . . untreated anger management which impairs her judgment and ability to protect her children . . . and places the children at substantial risk of serious physical harm in that the mother yells at and uses excessive profanity toward the children on a regular basis, and she hits [A.R.] out of frustration. . . . The mother's untreated anger management issues place[] the children at risk of physical harm, abuse, and/or neglect."  Mother received 12 months of family reunification services—including classes on parenting and anger management, individual counseling, and substance abuse treatment—after which services were terminated.  Mother's parental rights were terminated in September 2017.

*Referrals Regarding Minor and Voluntary Family Preservation Plan*

Mother and Minor (then three years old) began staying at a Catholic Charities family shelter on April 21, 2025.[6]

_____

[6] According to Mother, early in Minor's life, they "bounc[ed] from shelter to shelter" and "did not get stable housing till [Minor] was almost

4

On April 24, the Sonoma County Human Services Department (Department) received a referral alleging general neglect and emotional abuse of Minor by Mother.  It was reported that Minor was left unsupervised because Mother was " 'sleeping all day.' "  Mother reportedly would miss meals because she slept through them, and then she would say to Minor, " 'I guess you are going to starve' "; Mother would become very angry and berate Minor by cussing and screaming at Minor if she tried to wake Mother up.  In the incident precipitating the referral, it was reported that Minor knocked over a bottle of hot sauce in their room, then touched her own eyes and started crying.  Mother could be heard yelling, " 'what the fuck did you do, stop fucking screaming, you should clean this fucking mess up!' "  Mother then carried Minor out of their room naked and took her to the bathroom; staff attempted to help, but Mother would not talk to staff or "de-escalat[e]" and continued to scream at Minor, " 'You fuck everything up,' " while Minor continued to cry.

On May 13, the Department received a referral alleging physical and emotional abuse.  It was reported that Mother became highly upset after she realized she had forgotten to sign up for dinner service and was informed she would have to wait; Mother shouted and cursed at staff and then punched an elevator door and demanded that staff open the elevator manually.  Mother continued to yell in her room for two-and-a-half hours, and she could be "heard saying, 'There's no point in talking to you, you don't understand because you don't understand shit.' "

---

two" when they moved into an apartment.  Mother "was wrongfully evicted" in February 2025, and she and Minor lived in a U-Haul for a few weeks before they went to the Catholic Charities shelter in April 2025.

On May 15, the Department received a referral alleging physical and emotional abuse. It was reported that Mother dragged Minor on the ground in the hallway while shouting, " 'You are bullshit. Leave me the fuck alone. I cannot do this anymore.' "

In the emergency response investigation of these referrals, a social worker learned of "multiple troubling incidents" at the shelter. Shelter staff suspected Mother was using drugs onsite because drug paraphernalia, blood stains, and baggies were found in the bathrooms near Mother's room. Mother was often heard yelling obscenities at Minor, several residents and staff expressed concern for Minor's emotional and physical well-being, and there were concerns regarding Mother's "ongoing verbal aggression and emotional dysregulation." On May 2, it was reported that Mother was screaming loudly and aggressively at Minor, repeatedly calling her "a 'fucking bitch.' " It was reported that Mother had been heard shouting at Minor that she wished Minor was never born. Video surveillance taken on May 15 showed Mother "frantically pulling the child by the arm down a common hallway while yelling at her"; Minor tripped and fell and Mother "momentarily dragged her before stopping to pick her up."

Mother admitted to a social worker that she did often yell obscenities with Minor present, but she said she was not yelling at Minor and denied that Minor was impacted by the yelling.

Based on its investigation, the Department initiated a voluntary family preservation case for Mother and Minor on June 2, 2025. As part of the voluntary plan, on June 19, Mother agreed to attend weekly individual therapy, and the Department referred Mother to parenting education classes and offered her a referral for substance abuse treatment. Mother was also offered assistance in setting up an appointment for Minor to see an autism

specialist because Minor's pediatrician reported Mother had failed for several months to arrange this recommended assessment for Minor, and Mother was given a separate referral for assessment of Minor's mental health needs. Minor's pediatrician had been directing Mother to obtain a neuropsychological assessment of Minor for more than six months, and there was concern that Minor appeared to have "significant developmental delays, including being . . . non-verbal."

Mother's participation in the voluntary plan was minimal. In the following three months, Mother stated she was too busy to reply to service providers regarding individual therapy, so she did not begin therapy; Mother stated she would attend parenting class, but she did not do so; she refused substance abuse treatment; she failed to return calls and texts from the doctor's office for Minor's autism assessment; and Mother failed to show up for Minor's mental health assessment on two separate occasions in July 2025, and the referral was closed. Social worker Erin Guzman had several appointments with Mother that Mother either cancelled or failed to show up for.

After initiating the voluntary family preservation plan, the Department continued to receive reports of Mother verbally abusing Minor. On August 4, it was reported that Mother was emotionally volatile, yelling and cussing at shelter staff and residents, throwing things, pulling her own hair and hitting herself. This took place in front of Minor, who reportedly curled up in a ball and hid under a table.

*Removal of Minor Pursuant to Protective Custody Warrant*

On August 12, 2025, social worker Guzman went to the shelter for a scheduled visit with Mother and learned that Mother was no longer there. Guzman called and texted Mother who did not respond that day. On August

14, Mother texted Guzman that she had been kicked out of the shelter, and they arranged to meet at a public library. At the meeting, Mother told Guzman she had been evicted from the shelter "because 'they are just out to get me because they don't like me.'" Mother said she had to confront shelter staff because they were trying to poison her and Minor by giving them rotten food. Mother denied that she had been aggressive with staff and denied that Minor was bothered by what happened. Asked where she and Minor would stay that night, Mother said they would need to stay in the park. Mother said that although Minor was nonverbal and frequently wandered off, she would keep Minor safe by locking her in her stroller and by staying awake all night to watch that she did not wander off. Guzman got approval to pay for a hotel room for one night and planned to meet Mother again the next day.

The next day, August 15, Mother told Guzman she still had the same plan to stay in the park at night, and she could not identify any family or friends who might help with a safety plan for Minor. After consulting with her supervisor, Guzman obtained a protective custody warrant, and Minor was removed from Mother's custody that day.

*Current Dependency Petition*

On August 19, 2025, the Department filed a dependency petition on behalf of Minor. Under section 300, subdivision (b)(1) (failure to protect), paragraph b-1 alleged Minor "is observed to be non-verbal, makes limited eye contact," and "has suffered neglect of her physical and emotional health" due to Mother's "negligent failure to provide . . . adequate medical treatment and specialized services." Paragraph b-2 alleged Mother "is exhibiting signs and symptoms indicative of unaddressed mental health needs and/or substance use, which produce behavior that impede her ability to provide for [Minor's]

8

basic and specialized needs" and Mother "frequently curses and belittles the child and engages in physical violence in the presence of the child."[7]

Under section 300, subdivision (c) (serious emotional damage), paragraph c-1 alleged Minor "is suffering serious emotional damage due to . . . [Mother]'s behaviors," citing to Mother's "inadequately addressed mental health needs." Paragraph c-1 included the same facts alleged in paragraph b-2 regarding Mother's verbal and physical aggression and further described Minor curling her body in a ball and hiding under a table during one of Mother's outbursts.

Under section 300, subdivision (j) (abuse of sibling), paragraph j-1 alleged a petition was filed in Sacramento County in March 2016 on behalf of Minor's half-sisters A.R. and M.S. arising from domestic violence, Mother's failure to protect the children from the father's violence and substance abuse, Mother's "inadequately addressed anger management issues that impact[] her judgment including yelling excessive profanities towards the children and hitting the children," and Mother "not obtaining mental health or behavioral services for the children." It was further alleged that family reunification services were ordered in April 2016 and terminated in April 2017, Mother's parental rights were terminated in September 2017, A.R. and M.S. were adopted, and the case was closed in March 2018.

---

[7] Paragraph b-2 further alleged Mother yelled at Minor, " 'fucking bitch,' " " 'there's no point in talking to you, you don't understand because you don't understand shit,' " and " 'what the fuck did you do,' " among other statements, and commented that she wished Minor had never been born; Mother "has punched walls and thrown objects while yelling at other adults in the presence of [Minor], placing her in the zone of danger"; and she has admitted to relapsing on methamphetamine in May 2025.

9

*Department Recommendation to Bypass Services*

In its original jurisdiction and disposition report filed September 12, 2025, the Department recommended that the bypass provisions of section 361.5(b)(10) and (11), applied based on the dependency cases filed in Sacramento County in 2016 and Mother's failure to subsequently make a reasonable effort to treat the problems that led to the removal of Minor's half-siblings.

Regarding Mother's lack of reasonable effort, the Department observed that Mother was "not able to articulate what on-going progress she has made to remediate her anger management and manage her mental health." In addition, Mother denied any mental health diagnosis or concerns, which was contradicted by the record in the prior dependencies.

In an addendum report filed September 22, 2025, the Department recommended not offering Mother reunification services because such services would not be in Minor's best interest.[8] The report noted that Mother "has been receiving targeted and robust multidisciplinary interventions from multiple sources (medical, community based, the Department) since March of 2025," but "[s]he has continued to resist these services and treatment and has continued to place her child[]'s safety at risk as a result of her chronic neglect and emotionally damaging and physically unsafe behavior." Mother denied

___

[8] In its original report on jurisdiction and disposition, the Department recommended Mother receive reunification services, despite the applicability of the bypass provisions, in the "best interest of the child." However, the social worker who prepared the original report explained that "a number of new facts" had since come to her attention and those facts "necessitated a reevaluation of the best interest of the child, and the issue of bypass regarding the mother." "Based on this new evidence, the Department" submitted the addendum with the recommendation that reunification services not be offered to Mother.

current drug use, but at an in-person visit with Minor in September, Mother brought a duffel bag with clothes for Minor, and the resource parent later reported unpacking the duffel and finding a make-up bag that contained drug paraphernalia including a glass pipe with burn marks and white powder residue. Regarding Mother's efforts since the recent referrals, the Department reported that Mother did not appear at the detention hearing, she missed three scheduled meetings with her social worker and missed a TEAM meeting, and she had recently stopped responding to the social worker and at least three other providers. It was apparent to the social worker that Mother "is either not able to, or is not wanting to, participate in the case plan offered by the Department."

Assessing the strength of the bond between Minor and Mother, the Department reported that Minor "has demonstrated avoidance, and behaviors consistent with fear during visits with the mother." Since removal from Mother's care, Minor "has already made large improvements in her language, emotional regulation, social skills, and ability to tolerate stressors and interact with the wider world."[9]

Citing Mother's "longstanding issues with anger management, emotional health, and substance abuse," the report concluded, "The Department does not hold confidence that [Mother] would be able to demonstrate the large-scale lifestyle and behavior changes that are needed, within twelve months, given her consistent pattern of behavior in parenting

---

[9] Minor was placed with relatives and "quickly acclimated to the home environment and formed connections to each of the household members." Minor added new words to her vocabulary and improved her social interactions, "looking directly at people now when they speak to her and responding with emotions and facial expressions that match the context of the interaction."

her children over the past twenty-five years.[10]  It is for these reasons that it cannot be argued services would be in [Minor]'s best interest."

In another addendum report filed October 17, 2025, the Department continued to recommend that Mother not be offered reunification services.  It was reported that Mother had participated in three of 10 offered virtual visitations with Minor.  Minor's response to Mother during the virtual visits was "to move to the opposite side of the room, cover her face, and hide" or to turn away or not respond to Mother.

As to Minor's progress, the social worker "noted a marked change in [Minor]'s body language, facial expressions, emotional range, and language" with Minor now "much more socially typical for her age in her mannerisms and interactions."  Minor's classroom teacher reported that based on Minor's "quick developmental leaps in the [previous] two months, and [her] consistent pattern of positive engagement, [the teacher] now feels that some of the social-emotional and development deficits initially identified were in fact related to environmental factors, and are more indicative of neglect."

As to Mother's progress, Mother entered a residential program on October 3, 2025.  Mother had been referred to drug screening, a parent mentor program, and a program for anger management services, but she had not contacted any of these services.  Mother stated she wanted to continue individual therapy, but the therapist Mother had been working with reported that Mother had not been in contact with her and had not shown up for the two most recent appointments offered.

---

[10] There were referrals reporting similar volatile and abusive behavior by Mother in 2000 and 2004.  See footnote 2, above.

*Contested Hearing*

A contested hearing on jurisdiction and disposition began on October 23, 2025. The social worker who prepared the jurisdiction and addendum reports testified for the Department, and Mother testified on her own behalf. She opposed the Department's recommended disposition and sought reunification services.

Social worker Jessica Chitwood testified she was assigned Minor's case in August 2025. Chitwood initially recommended providing Mother family reunification services because Mother was the "sole and primary parent to [Minor] throughout her life" and Minor "did not have any other attachment figures or parents that we could turn to." However, she changed her recommendation because, she testified, "I had supervised a number of visits for the mother and [Minor] and noticed serious deterioration in the mother's behaviors, mood and affect, and I had witnessed the impact that the mother's presence was having on the minor and became concerned that this lengthy pattern of behavior for mom would not be changed regardless of the amount of services that we provided." Chitwood became concerned that Minor was "fearful of the mother and was displaying indicators that she was stressed and uncomfortable in the mother's presence." Chitwood saw "a radical difference in [Minor]'s presentation when interacting with nearly any other adult." In addition, Mother was frequently nonresponsive to Chitwood and was not responding to the referrals for service.

Before Chitwood completed her testimony, Mother's counsel objected to jurisdiction "simply based on the sufficiency of the evidence." The juvenile court found the Department met its burden of proof and sustained the petition as alleged as the basis for jurisdiction over Minor.

13

Mother's counsel offered evidence documenting Mother's current treatment program; a clinical manager's observation of a Zoom visit between Mother and Minor in October 2025 in which Mother demonstrated "patience, stress tolerance, and focus and attention on her daughter"; recent negative drug test results; Department service logs; reports from prior dependencies in Sacramento; a multidisciplinary assessment of Minor; a social worker's observation that a Zoom visit in November 2025 "seemed very positive and appropriate"; and parenting classes Mother completed in 2017.

Mother testified that she was currently staying at a drug treatment and harm reduction facility in San Francisco. When Minor was removed in August 2025, Mother "instantly relapsed." Asked how long she had been clean and sober before Minor was removed, Mother responded that she "was white knuckling it," explaining, "I wasn't always using, but I wasn't always clean."[11]

Mother described an in-person visit during which Minor "instantly ran up to me, and it was all hugs, but she was—she showed signs of being ready to go." In another visit, Mother "felt like [Minor] was a little bit upset because at first she was reserved; but that wore off" in the first few minutes.

---

[11] Later, in cross-examination by Minor's counsel, Mother testified, "What I mean by that is that, even though I wasn't using, I still had a lot of the same behaviors as if I was using, because I was going through a lot of depression and I wasn't getting the proper help that I needed as far as counseling and having, you know, good supportive people around me." Regarding her drug treatment in 2017, Mother testified that her older girls, A.R. and M.S., "were the glue to my sanity," implying that not seeing them had been harmful to her own recovery. Asked about her relapses between 2020 and 2025, Mother testified she did her best "to break away from all of that," but "it's not easy," and "breaking away from people who are destructive is even harder than breaking away from, you know, an addiction."

Mother acknowledged that Minor "was like kinda crying" and "she kept doing the whole eye-cover thing."

In the prior dependency cases in Sacramento County, "the majority" of the classes she was provided "were more geared upon parenting and anger management" and "maybe a small portion of it was DV." Mother testified, "I think anger management, like—is like—if you know you're the person like with the anger issues, but when you're not the person with the anger issues, it's hard to apply those things when no one else is applying the material." In her current treatment program, Mother worked on anger management "[d]aily."

Mother agreed that she had yelled around Minor, observing, "if anyone says they don't yell around their kids, they're lying," but she did not think her behavior affected Minor in a negative way. She acknowledged that she yelled at shelter staff, but she denied she cussed at them and maintained that she "was being respectful," but she "wasn't feeling well that day." She believed "some of the staff had maybe a bias" against her. Mother did not believe there were any safety concerns regarding Minor when she was removed other than that Mother was struggling with finding housing.

Mother believed she should receive reunification services because, she testified, "I'm a good mother, and [Minor] and I have a strong bond." Mother continued, "I was a really good mother to my other children as well. I feel like my shortcomings don't equal the punishment sometimes in my life, and I carry that burden around." She testified that she loved her kids "with all my heart."

*Ruling*

The juvenile court denied Mother reunification services. First, the court concluded the bypass provisions of section 361.5(b)(10) and (11), applied

15

based on (1) the Sacramento County dependency cases filed in 2016 and (2) its determination that Mother has not subsequently made a reasonable effort to treat the problems that led to the removal of Minor's half-siblings.

The court noted the 2016 petitions involved Mother's anger management issue, and "There is a history and a pattern of screaming, cursing, and verbal rages documented from 2004, 2013, and 2025." The court explained, "Here, there is simply no evidence of any efforts to treat. Her testimony regarding drug use was to, quote, white knuckle it. That is go without drugs. That is not treatment. There is no indication of therapy. No indication of parenting classes for the years between the two cases. When the same issues came up in June of 2025, as had existed in Sacramento County, Mom was offered the services previously referred to [i.e., individual therapy, parent education classes, and an assessment for drug abuse treatment], and she declined them. That is not a reasonable effort. In fact, that is no effort at all."

Next, the court determined Mother failed to prove reunification services would be in Minor's best interest. The court reasoned, "[Mother] testified on the stand yelling around my daughter does not affect her in a negative way. This is a similar sentiment that she offered to the social worker in June. Now, the significance of that is that after all of the classes that she has taken, she is of the opinion that her conduct, her behavior, has no negative affect on her child. . . . [¶] Mom has not met her burden of providing evidence to show reunification services would be in the minor's best interest. Mom has shown no insight into how her behavior has [a]ffected her child." The court further noted that Mother's "behavior of yelling, cursing, and screaming at [Minor] as well as others is a threat and a detriment to

16

[Minor's] physical and emotional health," but Mother has "not responded to treatment of that condition" and has "not even recognized it as an issue."

The juvenile court set a hearing under section 366.26.

**DISCUSSION**

A.    *Applicable Law and Standard of Review*

The bypass provisions at issue here are sections 361.5(b)(10) and (b)(11).  Under these provisions, "[r]eunification services need not be provided to a parent . . . when the court finds, by clear and convincing evidence," first, that either "[t]he court ordered termination of reunification services for any siblings or half siblings of the child because the parent or guardian failed to reunify with the sibling or half sibling after the sibling or half sibling had been removed from that parent" (§ 361.5(b)(10)(A)) or "the parental rights of a parent over any sibling or half sibling of the child had been permanently severed" (§ 361.5(b)(11)(A)) and, second, that the parent "has not subsequently made a reasonable effort to treat the problems that led to removal of the sibling or half sibling of that child from that parent" (§ 361.5(b)(10)(A) & (11)(A)).

"The 'reasonable effort[s]' necessary to avoid subdivision (b)(10) [or (11)] bypass are not synonymous with ' "cure." ' [Citation.]  They must, however, be more than ' "lackadaisical or half-hearted." ' [Citation.]  Moreover, not every 'effort by a parent, even if clearly genuine, to address the problems leading to removal will constitute a reasonable effort and as such render these provisions inapplicable.  It is certainly appropriate for the juvenile court to consider the duration, extent and context of the parent's efforts, as well as any other factors relating to the quality and quantity of those efforts, when evaluating the effort for reasonableness.  And while the degree of progress is not the focus of the inquiry, a parent's progress, or lack

17

of progress, both in the short and long term, may be considered to the extent it bears on the reasonableness of the effort made.' " (*Jennifer S. v. Superior Court* (2017) 15 Cal.App.5th 1113, 1121 (*Jennifer S.*), italics deleted.)

Section 361.5, subdivision (c)(2), further provides that "[t]he court *shall not* order reunification for a parent . . . described in paragraph . . . (10), (11) . . . of subdivision (b) *unless* the court finds, by clear and convincing evidence, that reunification is in the best interest of the child." (Italics added.)

We review the juvenile court's order denying services under section 361.5 for substantial evidence. (*Jennifer S.*, *supra*, 15 Cal.App.5th at p. 1121.) "[W]e do not make credibility determinations or reweigh the evidence. [Citation.] Rather, we 'review the entire record in the light most favorable to the trial court's findings to determine if there is substantial evidence in the record to support those findings.' " (*Id.* at pp. 1121–1122.)

When a bypass provision of section 361.5(b) applies, "[i]t is the parent's burden to prove that the minor would benefit from the provision of court-ordered services. We review a juvenile court's best interest determination in this context for abuse of discretion." (*Jennifer S.*, *supra*, 15 Cal.App.5th at pp. 1124–1125.)

B.  *Reasonable Effort*

Mother contends there was no substantial evidence supporting the juvenile court's finding by clear and convincing evidence that she did not make reasonable efforts to treat the problems that led to the removal of Minor's half-siblings.[12]  Recognizing that the court found she failed to prove

---

[12] Mother does not dispute that in the Sacramento County dependencies initiated in 2016, reunification services were terminated for Minor's half-siblings A.R. and M.S. because Mother failed to reunify with them and Mother's parental rights were permanently severed.

18

she made a reasonable effort to treat her longstanding issue with anger management, Mother argues she "is taking active efforts to curtail her anger, has articulated her desire for help, and has shown insight into her behavior."[13]

We have no difficulty, however, concluding that substantial evidence supports the juvenile court's finding regarding reasonable effort. The evidence shows the Department provided Mother with a voluntary plan on June 2, 2025, after receiving numerous referrals reporting Mother's verbally abusive behavior toward Minor. In response, Mother failed to pursue the offered individual therapy, parenting class, and substance abuse treatment. After Minor was removed on August 15, 2025, Mother did not appear at the detention hearing, she missed three scheduled meetings with her social worker and missed a TEAM meeting, and she stopped responding to the social worker and other providers. At the contested hearing in October 2025, social worker Chitwood testified Mother continued to fail to respond to referrals for service.

Further, as the juvenile court observed, there is no indication Mother pursued therapy, parenting classes, or otherwise made any effort to treat her anger management issue in the years between the termination of Mother's parental rights for Minor's half-siblings and the current petition. Indeed, Mother does not appear to recognize that she has an anger management problem. Mother has consistently denied that her behavior has any negative effect on Minor, and in describing the anger management programming she received in the 2016 dependency cases, she implied she was "not the person

---

[13] In this petition, Mother acknowledges that the 2016 dependency cases for A.R. and M.S. involved the same problem of anger management that is at issue in this case.

with the anger issues." Under these circumstances, we see no error. (See *Jennifer S.*, *supra*, 15 Cal.App.5th at p. 1122 [substantial evidence supported bypass where the juvenile court found "mother remained 'in denial of a lot of issues that she needs to work on and face' "].)

C.   *Best Interest*

The juvenile court expressly found that Mother failed to prove services would be in Minor's best interest, noting that Mother "has shown no insight into how her behavior has [a]ffected her child," she has "not responded to treatment of that condition," and she has "not even recognized it as an issue."

Mother argues the juvenile court abused its discretion in making this finding. Mother asserts she "has already engaged in many services," "[s]he is testing clean, she is active every day in her substance abuse program, and she is enrolled in parenting classes and individual counseling." Mother also notes that she previously parented Minor without intervention, and she has had positive and appropriate visits with Minor.

Mother's argument fails to demonstrate abuse of discretion. That some evidence in the record may support a finding that services would be in a child's best interest does not mean the juvenile court abuses its discretion when it reaches a contrary finding. (*Jennifer S.*, *supra*, 15 Cal.App.5th at p. 1126.) "[T]he contrary evidence mother marshals in this case does little to persuade us that the juvenile court abused its discretion in reaching the opposite conclusion from that which she seeks." (*Ibid*.)

In *Jennifer S.*, the Court of Appeal affirmed the juvenile court's finding that the mother failed to show services would be in the child's best interest, "given the extent of [the mother's] substance abuse history, her clear resistance to prior court-ordered treatment for this and related issues, her relatively recent engagement in services, and the young age of the minor."

20

(15 Cal.App.5th at p. 1125.)  Similarly, we find no abuse of discretion in this case, given Mother's longstanding history of verbal and emotional abuse (there were reports of screaming and abuse from as far back as 2000), her resistance to prior court-ordered treatment for this and related issues (in prior cases going back to 2004, Mother has been offered parenting and anger management classes, in-patient drug treatment, and mental health assessment and treatment, yet she denies she has an anger management problem), her relatively recent engagement in services (Mother failed to meaningfully engage in voluntary and court-ordered services for many months), and the young age of Minor (Minor was three-years old when the petition was filed).

## DISPOSITION

The petition for extraordinary writ is denied on the merits.  Our decision is final as to this court immediately.  (Cal. Rules of Court, rule 8.490(b)(2)(A).)

21

                                        _____

                                        Miller, J.

WE CONCUR:


_____
Richman, Acting P. J.


_____
Desautels, J.


A174959, *S. R. v. Sonoma County Superior Court*